**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Ricky Helmbrecht,

    Plaintiff

v.

Henderson Police Department, et al.,

    Defendants

Case No.: 2:21-cv-01357-JAD-EJY

**Order Granting Summary Judgment on Federal Claims and Remanding State-law Claims Back to State Court**

[ECF No. 7]

      This removed excessive-force suit arises out of law enforcement's non-fatal tasing and shooting of Ricky Helmbrecht, who was having "a mental health breakdown" and wielding a kitchen knife on a residential sidewalk.  De-escalation efforts, verbal warnings, and tasing proved unsuccessful, and when Helmbrecht retrieved the knife and faced the officers with it as they approached to arrest him, two of them deployed their firearms, shooting Helmbrecht four times.  Helmbrecht survived the incident and now brings an excessive-force claim against the officers; a *Monell* claim against the Henderson Police Department, the City of Henderson, and Henderson's Police Chief; and state-law negligence and battery claims against all five defendants.  The defendants move to dismiss or for summary judgment based primarily on qualified immunity.  Because I find that the officers' actions were objectively reasonable under the totality of the circumstances, they are entitled to qualified immunity, so I grant them summary judgment on Helmbrecht's excessive-force claim.  And because *Monell* claims are derivative of constitutional claims against officers, my finding as to the officers' qualified immunity proves fatal to Helmbrecht's *Monell* claim.  I then decline to exercise supplemental jurisdiction over the remaining state-law claims and remand this case back to state court.

**Background**

**I.    The court treats the defendants' motion as one for summary judgment.**

To their motion to dismiss, the defendants attach a CD containing video footage of the incident that was recorded by the officers' body-worn cameras (BWCs) and their vehicles' dash cameras.[1]  They also include sworn affidavits from both officers attesting to the videos' accuracy and authenticity.[2]  The defendants urge me to rely on this video evidence in ruling on their motion to dismiss and contend that doing so would not convert their motion into one for summary judgment because Helmbrecht incorporated the video footage into his complaint.[3]  Helmbrecht insists that "[t]here is no reference to the bodycam footage at any point in [his c]omplaint."[4]  The defendants reply that they believed in good faith that Helmbrecht's "[c]omplaint incorporated the video evidence because the [c]omplaint perfectly tracks the video evidence and even refers to the actual video time stamps."[5]

---

[1] ECF No. 7 at 30 (CD filed manually at ECF No. 8).

[2] ECF No. 8 at 4–5.

[3] ECF No. 7 at 5–6.  The defendants also briefly argue that because the video footage is a matter of public record and is not disputed, I can take judicial notice of it.  This request clearly exceeds the purview of judicial notice.  *See* Fed. R. Evid. 201; *Knickerbocker v. United States Dep't of Interior*, 2018 WL 836307 at *6 (E.D. Cal. Feb. 13, 2018) ("The government does not merely wish the court to take judicial notice of the fact that these videos exist: it requests the court take judicial notice of the contents of the video to purportedly show that the defendant rangers did not employ excessive force.  This obviously is disputed by plaintiff, and is far beyond the usual purposes of judicial notice.  Accordingly, the court declines to grant the government's request that judicial notice be taken.").  I decline to take judicial notice of the videos and instead consider them under FRCP 56's standards.

[4] ECF No. 10 at 7–8.  Helmbrecht is correct that his complaint contains no direct references to the video footage, but it does refer to precise times at which events unfolded—down to the second—which makes it appear as though he referred to the videos when drafting his complaint. ECF No. 1 at ¶¶ 41–42, 44.

[5] ECF No. 13 at 3 (citing ECF No. 1 at ¶¶ 41–49).

I cannot consider these videos unless I treat this motion as one for summary judgment.  It is true that the incorporation-by-reference doctrine allows a defendant to "seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'"[6]  But the Ninth Circuit has held that "the mere mention of the existence of a document is insufficient to incorporate the contents of a document."[7]  Here, Helmbrecht doesn't even mention the video footage in his complaint, so I cannot find that he incorporated the video footage by reference and treat the defendants' motion as one to dismiss.[8]

Because the video evidence is outside the four corners of Helmbrecht's complaint, I recognize this motion for what it is: one for summary judgment that must be evaluated under Federal Rule of Civil Procedure (FRCP) 56.[9]  A court may convert a motion from one to dismiss into one for summary judgment only if the parties are "given a reasonable opportunity to present all the material that is pertinent to the motion."[10]  The defendants styled their motion as a motion to dismiss or, in the alternative, for summary judgment, and Helmbrecht acknowledges that the court could "wish to convert defendants' motion to dismiss into a motion for summary judgment,"[11] so both sides anticipated that this motion would be treated as one for summary judgment.  Plus, Helmbrecht is represented by counsel, and he has had—and taken—a full

---

[6] *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (quoting *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

[7] *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *Ritchie*, 342 F.3d at 908–09).

[8] *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

[9] Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

[10] Fed. R. Civ. P. 12(d).

[11] ECF No. 10 at 8 (cleaned up).

opportunity to address the summary-judgment issues in his response brief.  So I find that all parties have had a reasonable opportunity to present all pertinent material such that this motion may fairly be considered under the summary-judgment standards.

Helmbrecht urges me to deny summary judgment based on FRCP 56(d) because "[he] has not been provided with complete body cam footage of the subject incident," and he intends to have an expert analyze it "to determine its veracity and completeness . . . ."[12]  But that declaration does not justify delay or denial under the rule.  Counsel offers no reason to believe that the footage (which this court has carefully reviewed, and which depicts from numerous angles the timeframe relevant to Helmbrecht's claim) has been altered or otherwise fails to fairly depict the material events.  Plus, Stringham and Hedrick supplied their own sworn declarations with the original motion in which they state under penalty of perjury that the videos are true, accurate, and complete copies of the footage of the incident.  Each specifically states that the videos have not "been modified, edited, or changed."[13]  So I cannot conclude that denying or delaying the entry of summary judgment on the qualified-immunity issue based on plaintiff's counsel's unsubstantiated authenticity concerns is warranted.

## II.    Summary of facts[14]

In the very early morning of August 1, 2020, Helmbrecht knocked on the door of his friend's neighbor's home in a residential neighborhood in Henderson.[15]  The neighbor answered

---

[12] ECF No. 10 at 4–5 (counsel's declaration).

[13] ECF No. 7 at 28–29.

[14] These facts are derived from Helmbrecht's allegations, the Declaration of Arrest (ECF No. 10 at 45–48), and my observations from the footage recorded by Hedrick's and Stringham's BWCs and their vehicles' dash cameras.  ECF No. 7 at 30.  The facts are undisputed unless otherwise noted.

[15] ECF No. 1 at ¶¶ 21, 23.

4

the door and asked Helmbrecht to leave, so he walked to the end of her driveway.[16]  She asked

Helmbrecht if he needed help and he asked her for water, which she gave him.[17]  She then

noticed that Helmbrecht was holding a kitchen knife, and she called emergency services,

relaying that Helmbrecht "was on the ground and collapsed," "was possibly looking for help,"[18]

and "was intoxicated and winded."[19]  She did not report that she felt threatened,[20] but she did

indicate that Helmbrecht was holding the knife to his own neck.[21]

Soon thereafter, around 4:42 a.m., Sergeant Charles Hedrick and his partner responded to

the call and arrived at the scene.[22]  BWC and dash-camera footage from multiple angles captured

the events from the officers' arrival until Helmbrecht received medical attention.[23]  When they

exited their vehicle, both officers had their firearms drawn, and Helmbrecht was standing on the

sidewalk.[24]  They began talking to Helmbrecht and attempted to de-escalate the situation by

asking him questions like "Sir, what happened tonight?" and saying "We can work through

---

[16] ECF No. 10 at 46.

[17] *Id.* at 4, 46.

[18] *Id.* at 45–46.

[19] ECF No. 1 at ¶ 28.

[20] *Id.* at ¶ 29.

[21] ECF No. 10 at 46.  Helmbrecht denies that he was holding a knife to his neck because "[v]ideo footage of the incident does not reveal" it.  *Id.* at 7.  But the neighbor stated that Helmbrecht held the knife to his neck around the time she called emergency services, which is before any video was being recorded.  *Id.* at 45.  And Helmbrecht notes that the *defendants* argue that Helmbrecht held the knife to his neck, *id.* at 7, but that information comes from the Declaration of Arrest that Helmbrecht himself attaches to his response brief.  *Id.* at 45.

[22] *Id.* at 45; ECF No. 1 at ¶ 32.

[23] ECF No. 7 at 30.  The CD contains four videos: the BWC footage from both Hedrick and Stringham and the dash camera footage from both officers' vehicles.  I have reviewed them all but primarily cite to Hedrick's videos throughout this order because he was at the scene longer than Stringham and thus captured the entire incident.

[24] *Id.* (Hedrick's BWC at 4:42:20).  A dog was present for the entire incident, standing near Helmbrecht, and its barking is audible throughout much of the footage.

what's going on."[25]  Throughout the encounter, the officers continually asked him for his name, but Helmbrecht didn't respond.[26]  Sergeant Hedrick also repeatedly told Helmbrecht "We don't want to hurt you" and "I don't want to shoot you."[27]  The officers asked Helmbrecht at least seven times throughout the encounter to put the knife down.[28]  They also warned him to stay back numerous times.[29]

About one minute after the officers arrived, Helmbrecht fell to the ground while still holding the knife, and Sergeant Hedrick told him to stay down.[30]  The officers continued asking Helmbrecht for his name and trying to de-escalate for the next two-and-a-half minutes, but Helmbrecht didn't answer.[31]  Helmbrecht then began to stand up, and Sergeant Hedrick told him "I need you to stay down" and "don't come closer please," and he asked him to drop the knife three times once he stood up.[32]  Once standing, Helmbrecht stepped off the curb into the street, stood for about five seconds, got back on the sidewalk, and knelt as if he was going to get back on the ground.[33]

At about this time, Officer Lane Stringham arrived on the scene, parked his vehicle, and exited it with his firearm drawn.[34]  Helmbrecht stood up fully and tossed the knife to the ground,

---

[25] *Id.* (Hedrick's BWC at 4:43:26, 4:44:09).

[26] *Id.* (Hedrick's BWC at 4:43:06, 4:43:54, 4:44:39, 4:45:18).

[27] *Id.* (Hedrick's BWC at 4:42:20, 4:45:00, 4:45:50).

[28] *Id.* (Hedrick's BWC at 4:42:33, 4:42:40, 4:42:45, 4:44:45, 4:46:02, 4:46:12).

[29] *Id.* (Hedrick's BWC at 4:42:20, 4:42:45, 4:43:00, 4:45:50).

[30] *Id.* (Hedrick's BWC at 4:43:06).

[31] *Id.* (Hedrick's BWC at 4:43:06–4:45:41).

[32] *Id.* (Hedrick's BWC at 4:45:41–4:46:12).

[33] *Id.* (Hedrick's BWC at 4:46:17–4:06:23).

[34] *Id.* (Hedrick's dash camera at 4:46:20; Stringham's dash camera at 4:46:20).

where it landed next to the curb.[35]  Sergeant Hedrick told Helmbrecht to stay away from the

knife as Helmbrecht started moving toward it, and Hedrick ran toward Helmbrecht with his

taser.[36]  Sergeant Hedrick then deployed the taser in dart-mode and shouted "taser!" four times.[37]

Helmbrecht appeared to be hit by the taser and fell to the ground but then immediately jumped

up again.[38]  Sergeant Hedrick shouted "get away from it!" as Helmbrecht reached for the knife;

grabbed it; and stood up on the sidewalk, facing Hedrick and his partner (who were also on the

sidewalk) while Stringham stood in the street nearby.[39]

Hedrick and Stringham then simultaneously fired a combined six bullets at Helmbrecht,

four of which hit him.[40]  Helmbrecht fell to the ground, the officers approached and handcuffed

Helmbrecht, medical care was administered, and Helmbrecht was transported to a hospital.[41]

Helmbrecht "fortunately survived the shooting" but "sustained extreme physical injuries due to

being shot and continues to experience physical symptoms."[42]  He filed this lawsuit in state court

---

[35] *Id.* (Hedrick's BWC at 4:46:25).

[36] *Id.* (Hedrick's BWC at 4:46:27).

[37] *Id.* (Hedrick's BWC at 4:46:29).

[38] *Id.* (Hedrick's BWC at 4:46:25–4:46:31; Hedrick's dash camera at 4:46:31).

[39] *Id.* (Hedrick's BWC at 4:46:32–4:46:34; Hedrick's dash camera at 4:46:33–4:46:34). Helmbrecht disputes whether he "even had the knife in his hand when he was shot." ECF No. 10 at 4, 7, 9, 18.  But it is clear, particularly on the footage from Hedrick's dash camera, that Helmbrecht picked up the knife after he was tased and was holding the knife when he was shot. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that the Eleventh Circuit "should have viewed the facts in the light depicted by [a] videotape" instead of the plaintiff's contradictory version of events).

[40] *Id.* (Hedrick's BWC at 4:46:33; Hedrick's dash camera at 4:46:33; Stringham's BWC at 4:46:33; Stringham's dash camera at 4:46:35).

[41] *Id.* (Hedrick's BWC at 4:46:33–4:47:25); ECF No. 10 at 46.

[42] ECF No. 1 at ¶¶ 46–47.

in June 2021, and the defendants removed it to this court in July 2021.[43]  Shortly after removal,

the defendants filed this motion to dismiss or, in the alternative, for summary judgment.[44]

**Discussion**

**I.      Hedrick and Stringham are entitled to qualified immunity from Helmbrecht's excessive-force claim.**

The thrust of Helmbrecht's suit is his excessive-force claim against Sergeant Hedrick and

Officer Stringham.  For this claim, Helmbrecht theorizes that Sergeant Hedrick's use of his taser

and both officers' use of their firearms constituted excessive force that was unnecessary because

he "was merely inebriated while holding a knife—posing no harm to anyone on the street, nor to

the officers."[45]  The defendants contend that both officers are entitled to qualified immunity from

claims arising over any aspect of this episode because "this was a dangerous and tense situation

that justified an immediate response."[46]  Helmbrecht replies that "a finding of qualified immunity

is premature at this time" and indicates his intent to engage in further discovery.[47]

**A.      Evaluating an officer's entitlement to qualified immunity**

Qualified immunity protects government officials "from money damages unless a

plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and

(2) the right was 'clearly established' at the time of the challenged conduct."[48]  Courts "have

discretion to choose which qualified-immunity prong to address first" and, depending on the

---

[43] ECF No. 1.

[44] I find this motion suitable for disposition without oral argument.  *See* L.R. 78-1.

[45] ECF No. 10 at 11.

[46] ECF No. 7 at 12.

[47] ECF No. 10 at 4–5.

[48] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

conclusion reached for the first-analyzed prong, "need not address the other."[49]  "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[50]  I start with the first prong: whether the officers violated a constitutional right.

### B.    There is no genuine dispute that these officers did not violate a constitutional right.

Helmbrecht pleads his excessive-force claim under the "Fourth, Eighth, and/or Fourteenth Amendments."[51]  As the defendants aptly point out, however, Helmbrecht "was not a convicted prisoner or a pretrial detainee, [so] only the Fourth Amendment applies."[52]  Force is excessive and violates the Fourth Amendment "when it is greater than is reasonable under the circumstances."[53]  Courts in the Ninth Circuit "approach an excessive[-]force claim in three stages."[54]  Courts first "assess the severity of the intrusion on the individual's Fourth

---

[49] *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (departing from the mandate in *Saucier v. Katz*, 533 U.S. 194, 207 (2001), that the first question must be resolved first)).

[50] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  Summary judgment is appropriate when the pleadings and admissible evidence, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[51] ECF No. 1 at ¶ 66.

[52] ECF No. 7 at 10 (citing *Graham v. Connor*, 490 U.S. 386, 395 & n.10 (1989); *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994)).  The defendants also note that Helmbrecht "does not dispute" this because he does not address the Eighth or Fourteenth Amendments in his response brief.  ECF No. 13 at 3, n.1.  I therefore dismiss Helmbrecht's excessive-force claim to the extent that he brings it under the Eighth and Fourteenth Amendments and consider it in the Fourth Amendment context only.

[53] *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

[54] *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

Amendment rights by evaluating the type and amount of force inflicted."[55]  Then they "evaluate the government's interests by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape."[56]  Finally, courts "balance the gravity of the intrusion on the individual against the government's need for that intrusion."[57]

### 1.   *Severity of the intrusions*

The first factor in the excessive-force analysis is "the quantum of force used," which is assessed "by considering 'the type and amount of force inflicted.'"[58]  Courts "must evaluate the nature of the specific force employed in a specific factual situation."[59]

### a.   *The shooting*

It is undisputed that Hedrick and Stringham's firearm use was the highest level of force—deadly force.  "The intrusiveness of a seizure by means of deadly force is unmatched."[60]  "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment."[61]

---

[55] *Id.* (quoting *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)).

[56] *Id.*

[57] *Id.* (quoting *Espinosa*, 598 F.3d at 537).

[58] *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2000) (vacated and remanded on other grounds)).

[59] *Bryan v. MacPherson*, 630 F.3d 805, 825–26 (9th Cir. 2010) (citations omitted) (citing *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).

[60] *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).

[61] *Id.* (cleaned up).

     **b.**  ***The tasing***

    The quantum of force associated with Helmbrecht's tasing is not as clear.  Sergeant Hedrick used the taser in dart-mode, which is when a pair of probes ("aluminum darts tipped with stainless steel barbs") are propelled "toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200[-]volt, low ampere electrical charge through the wires and probes and into his muscles."[62]  "The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless. . . . The tasered person also experiences an excruciating pain that radiates throughout the body."[63]

    When Sergeant Hedrick deployed the taser, Helmbrecht wasn't holding the knife; it was on the ground where he had tossed it seconds before.[64]  The officer deployed the taser only after his verbal commands to stay away from the knife failed, and it appeared that Helmbrecht was moving toward the knife.[65]  Had the taser been effective against Helmbrecht, I would conclude, as the Ninth Circuit did in *Bryan v. MacPherson*, that the use of it here constituted "an intermediate, significant level of force that must be justified by the governmental interest involved."[66]  The *Bryan* court arrived at that conclusion because the plaintiff's testimony revealed that he experienced a foreseeable risk from being tased while standing on asphalt: he "lost muscular control and fell, uncontrolled, face first into the pavement," shattering teeth and

---

[62] *Bryan*, 630 F.3d at 824; *see also* ECF No. 7 at 4, n.3.

[63] *Bryan*, 630 F.3d at 824 (citations omitted).

[64] ECF No. 7 at 30 (Hedrick's BWC at 4:46:25–4:46:29).

[65] *See supra* notes 28–29.

[66] *Bryan*, 630 F.3d at 826.

scraping his face.[67]  The taser's "barbed probe lodged in his flesh, requiring hospitalization so that a doctor could remove the probe with a scalpel."[68]

But Hedrick's dart-mode taser doesn't appear to have had similar effects on Helmbrecht. Though Helmbrecht fell one second after Sergeant Hedrick deployed his taser, Helmbrecht immediately jumped up again and grabbed the knife, standing up fully and facing the officers.[69] Unlike Bryan, Helmbrecht showed no signs of being limp and helpless, and his nervous system couldn't have been overridden because he stood up and grabbed the knife quickly after the taser's deployment.  While he did fall to the ground once tased, the video footage shows that he was immediately able to move freely.  So because Helmbrecht apparently wasn't significantly affected by the taser, I conclude that the use of it fell somewhere short of an intermediate, significant level of force, but I cannot fairly conclude what level of force was used.  So I evaluate instead whether the use of the taser against Helmbrecht in this case was reasonable, keeping in mind these facts.[70]

### 2.   *Governmental interest in the use of force*

"In evaluating the reasonableness of" the officers' actions, the court must "consider the governmental interests at stake."[71]  The governmental interest in the use of force is assessed "by examining [the] three core factors" identified by the U.S. Supreme Court in *Graham v. Connor*:

---

[67] *Id.* at 824.

[68] *Id.*

[69] ECF No. 7 at 30 (Hedrick's BWC at 4:46:29–4:46:31).

[70] *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (finding that the record was "not sufficient for [the panel] to determine what level of force is used when a taser is deployed in drive-stun mode," so instead proceeding "to determine whether [the] use of the taser . . . in this case was reasonable, keeping in mind the magnitude of the electric shock at issue and the extreme pain that [the target] experienced").

[71] *Mattos*, 661 F.3d at 443 (citing *Deorle*, 272 F.3d at 1279–80).

"the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[72]  The *Graham* factors "are not exclusive," and courts "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"[73]

The defendants don't contend that Helmbrecht committed a crime before the officers arrived at the scene, but they explain that it "was a dangerous and tense situation that justified an immediate response."[74]  They contend that Helmbrecht "was committing the crime of resisting arrest with a deadly weapon—a felony" when the taser was deployed and "assault with a deadly weapon on police officer—a felony" just before they shot him.[75]  Helmbrecht doesn't address this argument in his response brief, but he attaches a criminal complaint showing that he was charged with the latter crime.[76]  Even construing all inferences in the light most favorable to Helmbrecht, I find that this factor weighs in the officers' favor because Helmbrecht's holding of the knife and refusal to abandon it in response to repeated instructions provided a basis for the officers' use of force.[77]

The second and most important *Graham* factor is whether Helmbrecht posed a threat to the safety of the officers or others.[78]  As the video footage shows, no one other than the

---

[72] *Bryan*, 630 F.3d at 826 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[73] *Id.* (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

[74] ECF No. 7 at 12 (citing *Glenn v. Wash. Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011)).

[75] *Id.* (citing Nev. Rev. Stat. §§ 199.280, 200.471(2)).

[76] ECF No. 10 at 44.

[77] *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005)).

[78] *Mattos*, 661 F.3d at 441 (cleaned up).

officers—and a boisterous dog—was present or near Helmbrecht when the force was used.[79]  So this inquiry focuses only on whether he posed a threat to the officers.  "[A] 'simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.'"[80]

The videos of the incident, recorded on four different cameras, provide those objective factors and leave no genuine dispute that Helmbrecht posed a dangerous threat to the officers. Sergeant Hedrick and his partner tried to talk Helmbrecht down for more than four minutes, asking him at least seven times to put down the knife.  At no point did Helmbrecht verbally respond to any of the officers' questions or indicate a willingness to cooperate.  Despite Helmbrecht's radically different interpretation, the video footage shows without material dispute that he was moving toward the dropped knife just before he was tased and that he picked the knife up as the officers approached him.  Sergeant Hedrick initially attempted to use less-than-lethal force by deploying his taser.  When that failed and Helmbrecht regained control over the knife, the three officers were closer to Helmbrecht than they had been at any other point during the encounter, which was particularly dangerous given that Helmbrecht could have been close enough to harm them with the knife.  The Ninth Circuit has recognized that, "[i]f [a] person is armed[,] a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."[81]  These were "rapidly evolving circumstances," and I find that this factor weights in favor of the defendants.[82]

---

[79] About one minute after arriving at the scene, Hedrick asked one or two bystanders to go inside in case Helmbrecht were to come toward them.  ECF No. 7 at 30 (Hedrick's BWC at 4:43:36).

[80] *Id.* at 441–42 (quoting *Deorle*, 272 F.3d at 1281).

[81] *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

[82] ECF No. 7 at 14.

The third *Graham* factor—actively resisting arrest or attempting to flee—is a close call but ultimately weighs in Helmbrecht's favor.  The Ninth Circuit "draw[s] a distinction between passive and active resistance," and it has observed that resistance "should not be understood as a binary state, with resistance being either completely passive or active.  Rather it runs the gamut from the purely passive protester who simply refuses to stand, to the individual who is physically assaulting the officer."[83]  The Ninth Circuit urges that courts "must eschew ultimately unhelpful blanket labels" and notes that "[e]ven purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance."[84]  "The crux of this *Graham* factor is compliance with officers' request, or refusal to comply."[85]

The Ninth Circuit tends to find that this *Graham* factor tips in the plaintiff's favor and has been reluctant to conclude that even plaintiffs who refused to follow officers' commands but didn't attempt to flee were actively resisting.[86]  Although the Ninth Circuit hasn't addressed the active-resistance factor for an armed excessive-force claimant like Helmbrecht, its analysis in *Bryan v. MacPherson* and *Smith v. City of Hemet* is instructive.  In *Bryan*, the unarmed plaintiff complied with most of the officer's commands—except for one that he claimed not to hear—and didn't attempt to flee.[87]  The *Bryan* court found that "his conduct [did] not constitute resistance

---

[83] *Bryan*, 630 F.3d at 830 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994); *Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125, 1130–31 (9th Cir. 2002)).

[84] *Id.*

[85] *Mattos*, 661 F.3d at 450.

[86] *See, e.g.*, *id.*; *Bryan*, 630 F.3d at 830; *Smith*, 394 F.3d at 703.

[87] *Bryan*, 630 F.3d at 829–30.

at all" and if anything, was closer to passive or minor resistance than to active resistance.[88]   In *Smith v. City of Hemet*, the plaintiff repeatedly refused to follow the officers' instructions to remove his hands from his pockets and place them on his head, but he didn't attempt to flee, attack the officers, or threaten to attack them.[89]   The court concluded that "it does not appear that Smith's resistance was particularly bellicose" and that the third *Graham* factor provided little support for the use of significant force against him.[90]

Both *Bryan* and *Smith* are examples of plaintiffs passively resisting or not resisting at all. Here, Helmbrecht began that way but ended differently.   For the first few minutes after the officers arrived on this scene, Helmbrecht was passively resisting by refusing to comply with their requests—like in *Smith*—or to verbally respond to them.   From the video footage, it does not appear that Helmbrecht ever attempted to flee, much like Bryan and Smith.   But once Sergeant Hedrick deployed the taser, Helmbrecht's resistance shifted from passive (refusing to comply with commands to put the knife down) to active: he jumped up, grabbed the knife, and faced the officers.   This latter part of the incident is unlike both *Bryan* and *Smith*, which makes this factor a close call.   Construing these inferences in the light most favorable to Helmbrecht, I find that this factor weighs slightly in favor of Helmbrecht.   But in their totality, the *Graham* factors weigh in favor of a reasonableness finding.

### 3.   *Balancing the competing interests*

The final step in the excessive-force analysis is to "balance the gravity of the intrusion on the individual against the government's need for that intrusion."[91]   Any intrusion the taser caused

---

[88] *Id.* at 830.

[89] *Smith*, 394 F.3d at 703–04.

[90] *Id.* at 703; *see Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091–92 (9th Cir. 2013).

[91] *Thompson*, 885 F.3d at 586 (quoting *Espinosa*, 598 F.3d at 537).

was minimal because the video evidence shows it was ineffective against Helmbrecht.  But the intrusion caused by the four bullets—deadly force—that struck Helmbrecht was "unmatched."[92] The government had a strong interest in using force against Helmbrecht because of the threat he posed to the officers and the felonies he was in the process of committing: resisting arrest with a deadly weapon and assaulting an officer with a deadly weapon.

As I weigh these competing interests, Helmbrecht urges me to consider his mental state at the time of the incident and find that "it is objectively unreasonable to shoot an unarmed, mentally disturbed person who has been given no warning about the imminent use of serious force, poses no risk of flight, and presents no objective imminent threat to the safety of others."[93] But Helmbrecht was plainly armed, and he was given warnings about the imminent use of serious force.  In the Ninth Circuit, "an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation."[94]  While Sergeant Hedrick didn't specifically warn Helmbrecht that he would be shot, Hedrick and his partner both had their firearms drawn and raised during their attempts to de-escalate the situation.  And Hedrick said "I don't want to shoot you" and "we don't want to hurt you."[95]  Hedrick also shouted "taser!" four times as he approached Helmbrecht to tase him.[96]  Although Helmbrecht posed no risk of flight, he presented an objective imminent threat to the officers' safety because of his unwillingness to follow instructions and leave the knife on the ground.  So while it is evident that Helmbrecht was

---

[92] *Vos*, 892 F.3d at 1031 (quoting *Garner*, 471 U.S. at 9).

[93] ECF No. 10 at 10–11 (quoting *Deorle*, 272 F.3d at 1285).

[94] *Mattos*, 661 F.3d at 451 (citing *Bryan*, 630 F.3d at 831; *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004); *Deorle*, 272 F.3d at 1284; *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)).

[95] ECF No. 7 at 30 (Hedrick's BWC at 4:42:20, 4:45:00, 4:45:50).

[96] *Id.* (Hedrick's BWC at 4:46:29).

suffering from mental distress at the time of the incident, he was armed with a knife, had been

informed that deadly force could be used against him, and posed an immediate threat to the

officers' safety.[97]  Though his mental state at the time of the incident factors into my decision, it

doesn't outweigh the governmental interest in using force to protect the officers from

Helmbrecht's knife wielding.  I therefore conclude that Hedrick's and Stringham's use of force

was objectively reasonable and not excessive under the circumstances.  Because I find that the

officers acted reasonably under the totality of the circumstances, I need not reach the second

prong of the qualified immunity analysis: whether the right was clearly established at the time of

the challenged conduct.[98]

In sum, I find that the record shows without genuine dispute that the force that the

officers used was not greater than was reasonable under these circumstances.  Although

Helmbrecht offers a different characterization of the events, the videos show the unvarnished

reality of the situation that permits the court to "evaluate[] for objective reasonableness based

upon the information the officers had when the conduct occurred"[99] and judge the use of force

---

[97] The Ninth Circuit has "refused to create two tracks of excessive[-]force analysis, one for the mentally ill and one for serious criminals."  *Bryan*, 630 F.3d at 829.  But "even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual."  *Id.* (cleaned up).

[98] *Isayeva*, 872 F.3d at 946 (citing *Pearson*, 555 U.S. at 223).  If I were to address this prong, I would rely on *Kisela v. Hughes*, a 2018 Supreme Court case with facts analogous to those here.  *Kisela v. Hughes*, 138 S. Ct. 1148 (2018).  The parties agree that *Kisela* "is the most factually analogous case" to this one.  ECF No. 13 at 2, 9.  But Helmbrecht's analysis of it "is puzzling."  *Id.*  Helmbrecht extensively analyzes the Ninth Circuit's *Kisela* opinion without acknowledging that the Supreme Court overruled that decision, concluding the officer was entitled to qualified immunity.  *See* ECF No. 10 at 9–12.  The defendants characterize Helmbrecht's "entire qualified[-]immunity argument [as] based on the misinterpretation of a reversed Ninth Circuit case."  ECF No. 13 at 2.  Helmbrecht filed his response brief more than three years after the Supreme Court reversed the Ninth Circuit in *Kisela*.

[99] *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)).

1  "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

2  hindsight."[100]  After attempting to de-escalate the situation and failing to convince Helmbrecht to

3  abandon the knife, Sergeant Hedrick first tried using less-than-deadly force, which failed.

4  Helmbrecht then immediately retrieved the knife, confronting the officers with deadly force and

5  justifying the officers' counter use of deadly force.  So because Helmbrecht has not shown that

6  Hedrick and Stringham violated his constitutional right against excessive force, the qualified-

7  immunity doctrine shields them from this suit.

8  **III.     Helmbrecht's _Monell_ claim fails because he cannot show a constitutional violation.**

9          In his _Monell_ claim, Helmbrecht alleges that the Henderson Police Department (HPD),

10  the City of Henderson, and Chief Andres "developed and maintained policies, practices, and/or

11  procedures and/or customs exhibiting deliberate indifference to the constitutional rights of

12  persons in Henderson."[101]  In _Monell_ claims, "municipalities, including counties and their

13  sheriff's departments, can only be liable under § 1983 if an unconstitutional action 'implements

14  or executes a policy statement, ordinance, regulation, or decision officially adopted and

15  promulgated by that body's officers.'"[102]  These claims "require a plaintiff to show an underlying

16  constitutional violation," and "in the excessive[-]force context, a plaintiff cannot succeed on a

17  _Monell_ claim without establishing an _officer's_ deprivation of a federal right."[103]  Because

18  Helmbrecht has not established that Hedrick or Stringham deprived him of his Fourth

19  Amendment right against excessive force by either tasing or shooting him, a crucial element of

20

21  _____

   [100] _Id._ (quoting _Graham_, 490 U.S. at 396).

22  [101] ECF No. 1 at ¶¶ 83–104.

23  [102] _Rivera v. Cnty. of Los Angeles_, 745 F.3d 384, 389 (9th Cir. 2014) (quoting _Monell v. Dep't of Soc. Servs. of City of New York_, 436 U.S. 658, 690 (1978)).

   [103] _Lockett v. Cnty. of Los Angeles_, 977 F.3d 737, 741 (9th Cir. 2020) (citations omitted).

1  his *Monell* claim cannot be met.  So I also grant summary judgment on the *Monell* claim in favor

2  of HPD, the City of Henderson, and Chief Andres.

3

4  **IV.  The court declines to exercise supplemental jurisdiction over the remaining state-law claims.**

5          The resolution of Helmbrecht's federal claims against the defendants leaves only his

6  state-law claims for battery and negligence.  Because this case was removed based on federal-

7  question jurisdiction,[104] this court is exercising supplemental jurisdiction over these state-law

8  claims.  Federal courts are courts of limited jurisdiction, and they maintain supplemental

9  jurisdiction over state-law claims that "are so related to claims in the action" that they form the

10  same case or controversy with the claims over which the court has jurisdiction.[105]  But once a

11  plaintiff's federal claims are gone, the court may decline to exercise supplemental jurisdiction

12  over the remaining state-law claims.[106]  Because I have granted summary judgment on

13  Helmbrecht's federal claims, I decline to exercise supplemental jurisdiction over his remaining

14  claims, and I remand those claims back to state court where they originated.  So this case will

15  return to the state court and proceed there only on Helmbrecht's claims against all defendants for

16  battery and negligence.

17

18

19

20

21

---

22  [104] ECF No. 1 at 2.

    [105] 28 U.S.C. § 1367(a).

23  [106] *Id.* § 1367(c)(4); *see Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court.").

**Conclusion**

IT IS THEREFORE ORDERED that the Defendants' Motion for Partial Dismissal, or in the Alternative, Motion for Summary Judgment **[ECF No. 7] is GRANTED in part**. With good cause appearing and no reason to delay, the Clerk of Court is directed to:

- **ENTER PARTIAL FINAL JUDGMENT in favor of Hedrick and Stringham on Helmbrecht's Fourth Amendment excessive-force claim, and in favor of the Henderson Police Department, City of Henderson, and Chief Andres on Helmbrecht's *Monell* claim**, leaving only Helmbrecht's state-law battery and negligence claims against all defendants;

- **REMAND the remainder of this case back to the Eighth Judicial District Court for Clark County, Nevada; Department 14; Case Number A-21-836027-C;** and

- **CLOSE THIS CASE**.

_____
U.S. District Judge Jennifer A. Dorsey
April 11, 2022